FILED IN OPEN COURT
ON 6/18/14
Julie A. Richards, Clerk
US District Court
Eastern District of NC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:14-CR-14-1 (1)

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | I N D I C T M E N T |
| ) | |
| HARRY C. MANN ) | |

The Grand Jury charges that:

## INTRODUCTION

1. HARRY C. MANN, defendant herein, was a resident of Dare County, North Carolina.

2. The United States Department of Defense was a department of the United States, providing military forces needed to deter war and to protect the security of our country, and managing military installations and facilities on behalf of the United States.

3. The United States Navy was a component federal agency of the Department of Defense and, among other things, operated the Dare County Bombing Range ("hereinafter referred to as DCBR") in Dare County, North Carolina.

4. The Fleet Area Control and Surveillance Facility, Virginia Capes, was a division of the United States Navy.

5. MANN was employed by the Fleet Area and Control Surveillance Facility, Virginia Capes, as a Civil Service employee assigned to the Dare County Bombing Range. In 2003,

MANN was promoted to the DCBR Target Range Manager. As the Target Range Manager, MANN was responsible for, among other things, maintaining range facilities and ensuring targets were in fully operational status; and for ensuring the proper disposal of used military equipment or equipment that was no longer needed by the Navy for its operations at DCBR. MANN was further authorized to requisition equipment from the Defense Reutilization and Marketing Office ("DRMO") for use at the DCBR.

6. DRMO, now known as the Defense Logistics Agency Disposition Services ("DLA Disposition Services"), was a component federal agency within the United States Department of Defense. DLA Disposition Services disposed of excess property received from the military services.

7. Rudy Lozano, a resident of Chowan County, North Carolina, operated a salvage and recycling business known as R.L. Metals and Demolishing.

8. John Williams, a resident of Chowan County, North Carolina, operated a salvage and recycling business known as Williams Recycling & Salvage.

9. Sims Metal Management was a multi-national corporation engaged in the business of metals and electronics recycling, with recycling locations in North Carolina and Virginia, including locations in Edgecombe County and Craven County, within the Eastern District of North Carolina.

2

10. Liverman Metal Recycling, Inc. was a North Carolina corporation established in September 2005, for the purpose of recycling metal with a business location in Bertie County, North Carolina, within the Eastern District of North Carolina.

11. Nucor Corporation consisted of approximately 200 facilities engaged in the production of steel products. Nucor Corporation operated 23 scrap-based steel production mills and recycled steel. The David J. Joseph Company was a wholly-owned subsidiary of Nucor Corporation and operated as a scrap processing and trading company with a business location in Hertferd County, North Carolina, within the Eastern District of North Carolina.

12. Gutterman Iron and Metal Corporation, located in Norfolk, Virginia, purchased scrap metal, including copper, aluminum, brass, stainless steel, wire, and steel.

13. Scrap 58, located in Chesapeake, Virginia, purchased scrap metal, including, aluminum, copper, brass, stainless steel, and automobiles.

14. Gutterman Iron and Metal Corporation and Scrap 58 share common ownership.

COUNT ONE
(Conspiracy - 18 U.S.C. § 371)

15. Paragraphs 1 through 14 of this Indictment are hereby re-alleged.

16. Beginning in or about 2005, the exact date being unknown, and continuing up to and including May 2011, the exact date being unknown, within the Eastern District of North Carolina and elsewhere, defendant MANN, did combine, conspire, confederate and agree with Rudy Lozano and John Williams, and others known and unknown to the Grand Jury to commit offenses against the United States, to wit:

    a. to knowingly obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, that is, obtaining property from another, with his consent, under color of official right, in violation of Title 18, United States Code, Section 1951;

    b. to, directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally and for any other person or entity, in return for being influenced in the performance of any official act, in violation of Title 18, United States Code, Section 201(b)(2).

## PURPOSE OF THE CONSPIRACY

17. It was the purpose of the conspiracy for HARRY C. MANN to be enriched by cash kickbacks and bribes paid by John Williams, Rudy Lozano and others, in exchange for HARRY C. MANN'S exercise of his official position to cause government property to be disposed and recycled through their salvage and recycling businesses.

4

## MANNER AND MEANS

18. In furtherance of the conspiracy, defendant herein, HARRY C. MANN, along with others, employed the following manner and means:

a. MANN did use his official position and influence to arrange for the removal and disposal of government property from DCBR through Rudy Lozano, John Williams, and other unindicted co-conspirators.

b. MANN would contact Rudy Lozano and John Williams, either in person or by phone, and tell them which items of government property needed to be removed and disposed of from DCBR.

c. In some instances, MANN would accompany Rudy Lozano and/or John Williams throughout the range to identify specific items of government property that should be removed and recycled.

d. Thereafter, Rudy Lozano and John Williams would remove such government property from DCBR as directed by MANN, and would haul the government property to salvage companies and other businesses/persons for resale as scrap metal.

e. In some instances, Rudy Lozano, John Williams or their employees would strip a functioning vehicle at the range of working parts, sell such parts (including, without

5

limitation, the motor and batteries), and then scrap the metal from the vehicle.

f. In other instances, Rudy Lozano, John Williams, or their employees would chop the government property into sections or otherwise remove the metal contained in the property in order to secure the best price upon resale to the scrap metal recyclers.

g. Rudy Lozano and John Williams would sell the parts, materials, vehicles, scrap metal and various heavy equipment machines, to various scrap metal recyclers, including, but not limited to, Sims Metal Management, Liverman Metal Recycling, Inc., David J. Joseph Company, Gutterman Iron and Metal Corporation, and Scrap 58.

h. In some instances, Rudy Lozano, John Williams and/or their employees would keep the government property with the hope of using the item(s) in the future.

i. Rudy Lozano and John Williams paid the kickback to MANN in cash upon resale of the metal to the various scrapyards. The amount of the cash payments varied depending upon the type of metal scraped and the total weight, and in some instances, a percentage of the proceeds Lozano and Williams received from the sale of the scrap.

6

j. To facilitate the removal of government property from DCBR, MANN provided John Williams with a key to the gate to the range.

## OVERT ACTS

19. In furtherance of the conspiracy, and to effect the object thereof, there were committed by at least one of the co-conspirators in the Eastern District of North Carolina at least one of the following overt acts, among others:

a. In or about 2007 or 2008, the exact date unknown, Rudy Lozano transported and caused to be transported a military personnel carrier weighing approximately 40,000 pounds from DCBR to a recycler.

b. On or about March 17, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of 1.6875 tons, to Sims Metal Management.

c. On or about March 19, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of 1.1071 tons, to Sims Metal Management.

d. On or about March 22, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of 1.9375 tons, to Sims Metal Management.

e. On or about March 25, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of 1.2746 tons, to Sims Metal Management.

f. On or about March 29, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of 1.7946 tons, to Sims Metal Management.

g. On or about April 19, 2010, Rudy Lozano transported and caused to be transported portions of equipment from DCBR, total gross weight of 61,060 pounds, to Liverman Metal Recycling, Inc.

h. On or about April 22, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of .7679 tons, to Sims Metal Management.

i. On or about April 26, 2010, Rudy Lozano transported and caused to be transported portions of an aluminum runway from DCBR, total gross weight of 2.1161 tons, to Sims Metal Management.

j. On or about June 4, 2010, John Williams transported and caused to be transported approximately 39,250 pounds of counterweights and wire rope from DCBR to The David J. Joseph Company.

k. Beginning on or about December 1, 2010 and continuing up through December 2, 2010, and again, on or about January 10, 2011, John Williams hauled and caused to be hauled a total of approximately 200,000 pounds of aluminum runaway from DCBR to Scrap 58 in Chesapeake, Virginia.

l. On or about December 2, 2010, and again in January 2011, John Williams was paid for the aluminum runway from the recycler. John William received a total of approximately $148,500 for the aluminum runway from the recycler. Gutterman Iron and Metal Corporation paid John Williams on behalf of Scrap 58.

m. In December 2010, the exact date unknown, John Williams paid HARRY C. MANN approximately $59,900 in cash, representing a portion of the kickback demanded by MANN in connection with the disposal and sale of the aluminum runway removed from DCBR.

n. Sometime before March 8, 2011, John Williams paid MANN approximately $3,200 in cash for the following two pieces of equipment previously requisitioned by and sent to DCBR: a Dresser brand front loading tractor serial number 38060 and a Lowboy-Fruehauf heavy equipment trailer serial number 4c03626HF015701.

9

o. On or about March 31, 2011, MANN contacted John Williams and directed Williams to come to DCBR on April 1, 2011, to remove metal.

p. Between on or about April 1 and April 14, 2011, John Williams removed metal boxes from the DCBR and sold the scrap to Sims Metal Management for $59,884.

q. On or about April 16, 2011, John Williams gave MANN approximately $1,100 in cash representing the remaining portion of MANN's share in the sale of the aluminum runway removed from DCBR.

r. On or about May 18, 2011, MANN received and accepted $16,300 in cash from John Williams, representing payment to MANN in connection with the resale of the metal boxes to Sims Metal Management.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO
(Hobbs Act - Extortion Under Color of Official Right
In violation of 18 U.S.C. § 1951)

20. Paragraphs 1 through 7, 9 through 10, 18(a) through (i), and 19(a) through (i) of this Indictment are hereby re-alleged.

21. Beginning in or about 2005, the exact date being unknown, and continuing up to and including May 2010, the exact date being unknown, within the Eastern District of North

Carolina and elsewhere, defendant herein, HARRY C. MANN, did knowingly obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, that is, obtaining property from another with consent under color of official right; namely, by obtaining cash kickbacks, not due HARRY C. MANN or his office and to which HARRY C. MANN was not entitled, from Rudy Lozano, with his consent, under color of official right,

All in violation of Title 18, United States Code, Section 1951.

COUNT THREE
(Hobbs Act - Extortion Under Color of Official Right
In violation of 18 U.S.C. § 1951)

22. Paragraphs 1 through 6, 8, 9, 11 through 14, 18, and 19(j) through (r) of this Indictment are hereby re-alleged.

23. Beginning in or about 2009, the exact date being unknown, and continuing up to and including May 2011, the exact date being unknown, within the Eastern District of North Carolina and elsewhere, defendant herein, HARRY C. MANN, did knowingly obstruct, delay, and affect in any way and degree commerce, and the movement of articles and commodities in commerce, by extortion, that is, obtaining property from another with consent under color of official right; namely, by obtaining cash kickbacks, not due HARRY C. MANN or his office and to which

HARRY C. MANN was not entitled, from John Williams, with his consent, under color of official right,

All in violation of Title 18, United States Code, Section 1951.

COUNT FOUR
(Demanding, Seeking and Receiving Bribes,
In violation of 18 U.S.C. § 201(b)(2))

24. Paragraphs 1 through 7, 9 through 10, 18(a) through (i) and 19(a) through (i) of this Indictment are hereby re-alleged.

25. Beginning in or about 2005, the exact date being unknown, and continuing up to and including May 2010, the exact date being unknown, within the Eastern District of North Carolina and elsewhere, defendant herein, HARRY C. MANN, being a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally in return for being influenced in the performance of an official act; that is, HARRY C. MANN did demand, seek, receive, accept, and agree to receive and accept cash bribes from Rudy Lozano in connection with MANN'S decision to dispose of government property from DCBR through the use of Lozano's salvage and recycling business, with the amount of the cash bribes being based upon the weight and type of the metal salvaged from the particular item(s) disposed.

All in violation of Title 18, United States Code, Section 201(b)(2).

## COUNT FIVE
### (Demanding, Seeking and Receiving Bribes, In violation of 18 U.S.C. § 201(b)(2))

26. Paragraphs 1 through 6, 8, 9, 11 through 14, 18, and 19(j) through (r) of this Indictment are hereby re-alleged.

27. Beginning in or about 2009, the exact date being unknown, and continuing up to and including May 2011, the exact date being unknown, within the Eastern District of North Carolina and elsewhere, defendant herein, HARRY C. MANN, being a public official, directly and indirectly did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally in return for being influenced in the performance of an official act; that is, HARRY C. MANN did demand, seek, receive, accept, and agree to receive and accept cash bribes from John Williams in connection with MANN'S decision to dispose of government property from DCBR through the use of Williams's salvage and recycling business, with the amount of the cash bribes being based upon the weight and type of the metal salvaged from the particular item(s) disposed.

All in violation of Title 18, United States Code, Section 201(b)(2).

## COUNT SIX
*(Theft of Government Property,
In violation of 18 U.S.C. § 641)*

28. Paragraphs 1-6 of this Indictment are hereby re-alleged.

29. Beginning on or about August 11, 2009, the exact date being unknown, and continuing up to and including May 2011, the exact date being unknown, within the Eastern District of North Carolina and elsewhere, defendant herein, HARRY C. MANN, did knowingly and unlawfully embezzle, steal, purloin, and convert to his use, and the use of another, things of value of the United States and a department and an agency thereof, the value of which in the aggregate did exceed the sum of $1,000; specifically, on August 11, 2009, HARRY C. MANN ordered and caused to be ordered, on behalf of DCBR, a Bush Hog Model SQ 84 Cutter serial number 12-00942 for a purchase price of $2,250.00, and converted it to his own use.

All in violation of Title 18, United States Code, Section 641.

## FORFEITURE NOTICE AND FINDING OF PROBABLE CAUSE

The defendant is given notice of the provisions of 18 U.S.C. Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461, that all of his interest in all property specified herein is subject to forfeiture.

As a result of the foregoing offenses as alleged in this Indictment, the defendant shall forfeit to the United States any and all property, real or personal, constituting or derived from, proceeds traceable to the said offenses.

The forfeitable property includes, but is not limited to:

(1) $333,865.03 in U.S. currency, including but not limited to, the following property seized during the course of the investigation:

- a) $244,917.00 in U.S. currency seized from the residence of HARRY C. MANN on or about May 20, 2011;

- b) $39,868.52 seized from the bank account of HARRY C. MANN at East Carolina Bank on or about June 8, 2011;

- c) $5,472.51 seized from the bank account of HARRY C. MANN at the Navy Federal Credit Union on or about June 8, 2011;

- d) $43,584.00 paid by Sims Metal Management to cooperating defendant in or about the month of April 2011; and

- e) $23.00 seized from HARRY C. MANN's office at the DCBR on or about May 20, 2011.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

15

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

The Grand Jury finds probable cause to believe that the property described herein and for the reasons stated herein is subject to forfeiture in accordance with 18 U.S.C. § 981.

A TRUE BILL:

_____  6/17/2014
FOREPERSON

THOMAS G. WALKER
United States Attorney

*[signature]*

BY: SUSAN B. MENZER
Assistant United States Attorney
Criminal Division

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.