# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## NORTHERN DIVISION
## No. 2:14-CR-14-D

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **ORDER** |
| | ) |
| HARRY C. MANN, | ) |
| | ) |
| Defendant. | ) |

On December 11, 2014, the court held a pretrial conference and set this matter for trial for April 13, 2015 [D.E. 49]. On April 5, 2015, Harry C. Mann ("Mann" or "defendant") filed a motion for an order directing the United States ("government") to produce to this court for in camera review the criminal history records of the witnesses it intends to call at trial to determine if there was exculpatory or impeachment material in those records that should have been disclosed under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny. See [D.E. 61]. On April 6, 2015, the court granted Mann's motion [D.E. 67]. On April 8, 2015, the court held a pretrial conference. See [D.E. 70]. At the conference, the government admitted that it had not produced to defense counsel a full criminal history concerning one of its witnesses, Rudy Lozano, an alleged coconspirator who had already entered a guilty plea in a related case and had agreed to cooperate with the government as part of his plea agreement. See [D.E. 78] 16–18; Plea Agreement at 3, United States v. Lozano, No. 2:13-CR-11 (E.D.N.C. May 9, 2013), [D.E. 17]. The court ordered the government to immediately produce all Giglio material to defense counsel and to file a notice with the court by April 9, 2015, confirming that the government had complied with its Giglio obligations. See [D.E. 78] 18–19, 30.

On April 11, 2015, Mann moved to dismiss the indictment for "wrongful deprivation of defendant's right to counsel of his choice" or, alternatively, for the release of seized assets [D.E. 75]. On April 12, 2015, Mann moved to dismiss the indictment for Brady and Giglio violations [D.E. 76]. On April 13, 2015, Mann filed a "notice of additional facts" regarding his motions to dismiss [D.E. 77].

In light of the allegations raised in Mann's motions and notice, the court continued the trial and ordered the government to respond to Mann's motions [D.E. 79]. On April 17, 2015, the government filed a notice of compliance with Giglio [D.E. 81]. On May 1, 2015, the government responded in opposition to Mann's motions to dismiss [D.E. 86, 87]. On May 8, 2015, Mann replied [D.E. 89, 90]. On May 22, 2015, the government filed a surreply to Mann's motion to dismiss for Brady and Giglio violations [D.E. 93]. On May 27, 2015, the government filed a surreply to Mann's motion to dismiss for wrongful deprivation of the right to counsel [D.E. 94].

On June 16, 2015, Mann filed a motion to dismiss the indictment for grand jury and other government misconduct [D.E. 96], a motion for discovery [D.E. 97], a motion to dismiss counts one, two, and three for failure to state an offense [D.E. 98], and a motion for a subpoena [D.E. 99]. On June 22, 2015, the government responded to Mann's motion to dismiss the indictment for grand jury and other misconduct [D.E. 105]. On June 23, 2015, Mann replied [D.E. 106]. On June 26, 2015, the government responded to Mann's motion for discovery. See [D.E. 110, 112]. On June 27, 2015, Mann replied [D.E. 111]. On June 30, 2015, the government responded to Mann's motion to dismiss counts one, two, and three for failure to state an offense [D.E. 113]. On July 9, 2015, the government filed a second response to Mann's motion to dismiss for grand jury and other government misconduct [D.E. 114].

2

On July 24, 2015, the court held oral argument on all pending motions. At oral argument, the court granted in part and denied in part Mann's motion for discovery, denied Mann's motion to dismiss counts one, two, and three for failure to state an offense, and granted Mann's motion for a subpoena. See [D.E. 124]. As explained below, the court denies defendant's remaining motions to dismiss, but grants defendant's alternative motion for the release of seized assets.

I.

In August 2010, the Naval Criminal Investigative Service ("NCIS") began investigating allegations that Mann, manager of the Navy Dare County Bombing Range ("Range"), was stealing government property. The alleged scheme involved acquiring surplus equipment from the Defense Reutilization and Marketing Office ("DRMO") at no cost and then selling the property.

NCIS Special Agent Bates learned that the Range had acquired at least $8,376,183 in property from DRMO between December 2006 and August 2010. See [D.E. 87-2]; [D.E. 87] 12–13 & 13 n.8 (claiming that the figure was closer to $12 million). Agent Bates also learned from Inspector Gillam of the North Carolina Division of Motor Vehicles that Mann was selling functional pieces of equipment at a fraction of their value, that the scheme involved a man named Rudy Lozano, and that a Dresser front-end loader valued at $64,774 that was supposed to be at the Range was on Jerry Mansfield's property. Agent Bates confirmed via surveillance that the Dresser front-end loader was on Mansfield's property and had been painted yellow to cover its original Army green color. See [D.E. 87] 2–3.

During January 2011, agents interviewed Navy employees at other bombing ranges to learn the procedures for disposing of surplus government property (whether functional or destroyed). Agents learned, among other things, that ordnance technicians had to certify that all items removed from a Navy range were ordnance-free before removal. See [D.E. 87-3].

3

In March 2011, NCIS Agent Ryan temporarily replaced Agent Bates. [D.E. 87] 3. On March 3, 2011, Inspector Gillam told Agent Ryan that he had conducted a traffic stop of a truck containing military helicopter parts. Id. 3–4. According to the driver, Rudy Lozano had obtained the helicopter, largely whole, from the Range, cut it up, and sold the parts to local metal recyclers. See id.

On March 7, 2011, Agent Ryan interviewed Lozano. Id. 4. Lozano told Agent Ryan that he had taken property from the Range since 2004 and, in return, paid Mann cash kickbacks. Id. Lozano estimated earning approximately $100,000 from the property he removed. Id. Lozano said he would assist the investigation, but that Mann had barred Lozano from the Range in 2010. Id. Lozano stated that he believed that Mann replaced Lozano with John Williams (and others) because Williams and others would pay Mann more than Lozano would pay. Id. Lozano also told Agent Ryan how he paid Mann, that Mann demanded cash, and that Mann insisted that Lozano make payments to Mann only when no one else was present. See [D.E. 87] 4.

On March 8, 2011, Agent Ryan obtained a federal search warrant to seize the government property on Manfield's property. See id.; [D.E. 87-10] ¶ 22(a). On March 8, 2011, agents executed the search warrant and seized the yellow Dresser front-end loader and a trailer with a U.S. Navy license plate. See [D.E. 87] 4; [D.E. 87-10] ¶ 22(a). Agents interviewed Mansfield, who told agents that Williams owned the Dresser front-end loader. [D.E. 87-5]. Mansfield also told agents that he regularly drove a truck onto the Range, removed equipment from the Range, and hauled the equipment to recyclers in North Carolina and Virginia. Id. Mansfield examined a photograph of Mann and identified Mann as the "bossman." See id.

On March 31, 2011, agents interviewed Williams, who agreed to cooperate in the investigation. Id. Williams told the agents that he had been removing property from the Range for about a year, selling the property, and paying cash to Mann. Id. According to Williams, he removed

4

approximately 171,000 pounds of aluminum from the Range, sold it for 80 cents a pound, received $137,000, and paid Mann $59,000. Id. Williams also said that he still owed Mann another $1,100. See id.

Agent Ryan asked Williams to be part of an undercover operation concerning Mann, and Williams agreed. Id. 5–6. On April 1, 2011, Williams met with Mann while Mansfield and Jerry Brickhouse, who worked for Williams, removed several large metal boxes from the Range. Id. 6. Mansfield then took the metal boxes to Sims Metal Management ("Sims") in Chesapeake, Virginia, and received a check payable to Williams for $7,920. Id. The next weekend, Mansfield returned to the Range, picked up six loads of large metal boxes, hauled them to Sims, and received a check from Sims payable to Williams for $51,964. Id.

Williams provided both checks to Agent Ryan. Id. With Inspector Gillam's help, the agents opened an undercover account at Southern Bank and deposited the two checks, which totaled $59,884. See id.

During the weekend of April 16, 2011, Mann and Williams supervised while Mansfield and others removed more metal boxes from the Range. Id. Williams, who was wearing an audio recording device, told Mann that he estimated the boxes weighed a total of 200,000 pounds. Id.; [D.E. 87-4] 5–6. At fifteen cents per pound, Williams told Mann that he estimated Mann's payoff would be $30,000. [D.E. 87-4] 5–6; [D.E. 87-5] 6. Williams also handed Mann $1,100 and said, "That's the . . . money for the rest of the aluminum runway." [D.E. 87] 7; [D.E.87-4] 7.

After the weekend of April 16, 2011, Williams became ill and could not travel. [D.E. 87] 7. Mann, however, continued to call Williams about removing property from the Range and paying Mann the cash that Mann was due. Id. On May 12, 2011, Williams told Agent Ryan that Mann had called Williams at approximately 10:00 a.m. and asked where his money was and when Williams

5

could return to the Range to remove 60 to 90 aluminum bomb fins. See id.

At Agent Ryan's direction, Williams returned Mann's call and agents recorded it. See id.; [D.E. 87-5]. Williams told Mann that Williams's brother-in-law "Pat" was going to help Williams while Williams was ill. [D.E. 87-5] 2–3. "Pat" was really Agent Gookin. During the conversation, Williams told Mann that he would get him "that money next week . . . ." Id. 3. Williams also stated that the price of brass had increased and asked Mann whether he "still got them hulls" Id. Williams told Mann that he could get "probably a dollar seventy-five [per pound] for them." Id. 4. Mann responded that they could talk "later on." Id.

On May 13, 2011, Agent Gookin (posing as "Pat") drove Williams's truck to the Range. Gookin was equipped with an audio recording device and a camera. [D.E. 87] 8. Mansfield and Jerry Brickhouse were loading metal boxes when Mann arrived. See [D.E. 87-6]. Agent Gookin (posing as "Pat") asked Mann about the "bomb wings." See [D.E. 87-7] 2. Mann responded: "Yeah, there's a lot of them laying out there right now." Id. Mann asked Brickhouse whether he had put 50 bomb fins in the metal boxes. See id. Mann also suggested loading bomb fins in Williams's pickup truck. Id. 3. Mann said he wanted to get rid of the bomb fins because they were filled with styrofoam and made a mess of the Range when bombed or strafed. Id. 7–8; see [D.E. 87-4] 11. Agent Gookin and Brickhouse returned to the Range three hours later. [D.E. 87-7] 13. At Mann's direction, they removed more bomb fins. See id. 13–18.

On May 14, 2011, Agents Gookin, Mansfield, and Brickhouse returned to the Range. [D.E. 87-8] 2, 11. Mann showed Agent Gookin how to stack the metal boxes with a forklift, and they removed more metal boxes. See id. 9–13.

On May 18, 2011, Williams told Mann in a recorded telephone call that he had some cash to pay Mann. [D.E. 87] 9. Agent Gookin and Williams had a Gateway bank envelope containing

163 $100 bills that they had withdrawn from the undercover bank account. Id.; see [D.E. 87-9] 2. At Agent Gookin's suggestions, Williams wrote "Harry" on the envelope. [D.E. 87] 9; see [D.E. 87-9] 2. After arriving at Mann's residence, Williams got out of his truck and started talking with Mann. See [D.E. 87-9] 2–3. Mann said to Williams,

[D]on't mention them casings about, uh, you'll be down here and you'll give me that on the casings. If I . . . if you ever say anything about it, if anybody comes back on a telephone, they can get me for that . . . . So don't . . . don't mention about it. . . .

Id. 4. Mann then agreed to give Williams the casings that he had at the Range and his home. Id. 5.

Williams asked Mann about copper wire that he had seen at Mann's home. See id. 6. Williams said "that's done gone up to three dollars and fifty cents." Id. Mann replied, "That's good. That's good. . . . I'm all for that . . . ." Id.

Williams tried to hand the $16,300 in cash to Mann. Mann did not take the money; instead, Mann motioned to a flower pot and said, "That way I ain't never took nothing from you." Id. 7. "Never took nothing," Mann repeated. Id. Williams replied, "[T]hat's a hundred thousand . . . a hundred and eleven thousand pounds. That's sixteen thousand three hundred or four hundred." Id. Williams left the envelope containing the $16,300 in cash in a flower pot at Mann's residence.

On May 20, 2011, Magistrate Judge Jones issued search warrants concerning Mann's residence and office. [D.E. 87] 10. On May 20, 2011, government agents executed the warrants and seized, among other things, $245,037 in cash from Mann's residence and $23 from Mann's office. See [D.E. 36] 4; Superseding Indictment [D.E. 37] 15; Indictment at 12, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. Apr. 3, 2013), [D.E. 1]; cf. [D.E. 87] 10; [D.E. 75] 2.

On May 20, 2011, Magistrate Judge Jones also issued seizure warrants for three bank accounts that Mann controlled. Magistrate Judge Jones issued the seizure warrants based on an affidavit of Special Agent Heather Ferris. See [D.E. 87-17, 87-19]. In her affidavit, Agent Ferris

7

stated that a criminal investigation had revealed that Mann had violated 18 U.S.C. §§ 641, 1341, and 1343, and identified several bank accounts that Mann controlled. Agent Ferris also asserted that the bank accounts contained "assets/proceeds from the specified unlawful activity . . . or substitute assets/proceeds" from the specified unlawful activity. [D.E. 87-17] 2. When Agent Ferris made this statement in the affidavit about the bank accounts, the government had not yet received bank records concerning the bank accounts and did not have any evidence that the bank accounts contained assets or proceeds from Mann's alleged unlawful activity. See July Hr'g Tr. [D.E. 135] 65–68; Gov't Surreply Mot. Dismiss Wrongful Deprivation [D.E. 94] 1 n.1. On May 20, 2011, the seizure warrants were executed against two of Mann's accounts at the East Carolina Bank and one account with the Navy Federal Credit Union. See [D.E. 87-19].[1]

After the government executed the search warrants at Mann's residence and office, Mann retained criminal defense attorney John Keating Wiles of Cheshire Parker Schneider & Bryan. See [D.E. 87-2].

The record is unclear regarding how much real property Mann owned in 2011. Compare [D.E. 89-6] (email noting that Mann owned 36 properties in Dare County and one property in Washington County), with Gov't Resp. Mot. Farmer Hr'g [D.E. 43] 6 (noting that Mann had an interest in 39 real properties), and [D.E. 43-1] (Higgins affidavit stating that "[o]ver the years Mr. Mann has purchased over forty properties"). In late June 2011, the government filed lis pendens

---

[1] The warrant returns state that the seizure warrants against the bank accounts were executed at 2:30 p.m. on May 20, 2011. See [D.E. 87-19]. However, the forfeiture notices in each of the indictments against Mann claim that the bank accounts were seized "on or about June 8, 2011." See Indictment at 12, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. Apr. 3, 2013), [D.E. 1]; Indictment [D.E. 1] 15; Superseding Indictment [D.E. 37] 15. The court assumes the bank accounts were seized on May 20, 2011.

on at least 36 of Mann's real properties. See [D.E. 123-1] 19–21; [D.E. 128].² When the government filed the lis pendens Mann had not yet been indicted. All of the notices of lis pendens stated that an "action will shortly be commenced in the United States District Court for the Eastern District of North Carolina . . . for seizure, arrest, and forfeiture of the defendant real property . . . pursuant to 18 U.S.C. Section 981." [D.E. 128-1–128-36].

Although the seizure warrants were issued in May 2011, the government did not obtain an indictment against Mann until April 2013. See Indictment, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. Apr. 3, 2013), [D.E. 1]. In the time period between the execution of the May 2011 search warrants and the April 2013 indictment, Mann (through his counsel Wiles) and the government engaged in plea negotiations, but they did not reach an agreement. July Hr'g Tr. 63; cf. [D.E. 13, 14]. The April 2013 indictment charged Mann with one count of conspiracy to embezzle, steal, purloin, and convert to his own use property of the United States in violation of 18 U.S.C. § 371, and three counts of theft of government property and aiding and abetting in violation of 18 U.S.C. §§ 641 and 2. See Indictment, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. Apr. 3, 2013), [D.E. 1]. The April 2013 indictment contained a forfeiture notice regarding personal property, real property, and currency in the amount of $6,743,865.40. See id. at 12. The forfeiture notice noted that "forfeitable property" included "currency seized during the course of the investigation," including the $245,037 seized from Mann's residence in May 2011 and the $45,388.03 that was seized from

_____

² On July 28, 2015, the court ordered the government to file a copy of each of the notices of lis pendens that were placed on Mann's real properties, along with the notices of withdrawal, and the corresponding state-court dockets. See [D.E. 127]. In response to the court order, the government filed 36 exhibits, each of which corresponded to one property. See [D.E. 128-1–128-36]. In a brief submitted in November 2014 and at the status conference in December 2014, however, the government represented to the court that it had filed 39 lis pendens against Mann. See, e.g., Gov't Resp. Mot. Farmer Hr'g [D.E. 43] 6.

Case 2:14-cr-00014-D   Document 143   Filed 10/13/15   Page 9 of 40

Mann's bank accounts pursuant to the seizure warrants. Id.

On April 23, 2013, Wiles entered a notice of appearance as Mann's counsel concerning the April 2013 indictment. See Notice of Appearance, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. Apr. 23, 2013), [D.E. 8]. In mid-2013, Mann met with Joseph B. Cheshire, V, of Cheshire Parker Schneider & Bryan in an effort to secure Cheshire's legal services. See Cheshire Aff. [D.E. 75-8]. Although Mann could afford to hire and had hired Cheshire's law partner Wiles, Mann was unable to afford Cheshire's services. Id. According to Cheshire, "the reason [Mann] could not afford [Cheshire's] services was that the Government had seized nearly all of [Mann's] assets in May 2011," and had Mann had "access to the funds seized by the government in May 2011," Mann "could have afforded [Cheshire's] services." Id. Because Mann could not afford Cheshire's fee in mid-2013, Cheshire suggested that Mann hire Cheshire's law partner Elliot S. Abrams. Id. On November 1, 2013, Abrams entered a notice of appearance on Mann's behalf concerning the April 2013 indictment. See Notice of Appearance, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. Nov. 1, 2013), [D.E. 31].

On July 9, 2013, the government transferred the cash seized from Mann's home and office to the United States Marshals Service [D.E. 123-1] 26, 28. At oral argument in July 2015 on the motions to dismiss, the government acknowledged that the cash seized from Mann in May 2011 "was put in the form of a check and then deposited" and that the cash was "gone." July Hr'g Tr. 33.

On June 18, 2014, the government obtained a new indictment, which charged Mann with substantially different crimes than the April 2013 indictment. See [D.E. 1]. The June 2014 indictment charged Mann with one count of conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371, two counts of extortion under color of official right in violation of 18 U.S.C. § 1951, two counts of demanding, seeking, and receiving bribes in violation of 18 U.S.C.

10

§ 201(b)(2), and one count of theft of government property in violation of 18 U.S.C. § 641. See id. The June 2014 indictment contained a significantly reduced forfeiture notice. See id. 15 (reducing the forfeitable property to currency in the amount of $333,865.03). The June 2014 indictment listed as forfeitable property $244,917 in currency seized from Mann's residence in May 2011, $45,341.03 seized from Mann's bank accounts pursuant to the seizure warrants, $43,584 paid by Sims Metal Management to a cooperating witness in April 2011, and $23.00 seized from Mann's office in May 2011. Id.

On June 25, 2014, the government moved to dismiss the April 2013 indictment. See Motion to Dismiss, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. June 25, 2014), [D.E. 42]. On June 26, 2014, the court granted the motion and dismissed the April 2013 indictment. See Order, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. June 26, 2014), [D.E. 44].

On July 8, 2014, Mann appeared before Magistrate Judge Swank for his initial appearance concerning the June 2014 indictment, and Abrams entered a limited appearance for that proceeding. See [D.E. 9]; [D.E. 13]; [D.E. 14] 2. On July 18, 2014, Abrams wrote the court and stated that Mann had not yet retained Cheshire Parker Schneider & Bryan concerning the June 2014 indictment and that the firm would "not be able to make an appearance in this very complicated matter without being retained for what may be a lengthy trial." [D.E. 13]. Abrams also stated that the government had informed Mann "that it plan[ned] to dissolve the lis pendens on Mr. Mann's properties in the near future" and that because Mann wanted them "to continue as his lawyers, . . . [Mann] is attempting to obtain a loan on the formerly encumbered properties in order to hire [the] firm to represent him." Id. Abrams added that "We are comfortable that Mr. Mann can meet our fee requirements given a reasonable amount of time, and as soon as this happens, we will file a notice of appearance and will be in a position to go forward." Id.

11

On July 25, 2015, the government filed notices of withdrawal for each of the lis pendens. See [D.E. 128-1–128-36]. On July 30, 2014, the government moved for Mann to secure counsel or to request court-appointed counsel [D.E. 14]. In August 2014, the government gave notice to Mann "that it had released the lis pendens on his rental properties." [D.E. 75] 8. On August 29, 2014, the court ordered Mann to secure counsel or request the appointment of court-appointed counsel no later than September 8, 2014 and ordered counsel for Mann to file a notice of appearance on or before September 12, 2014. See [D.E. 15]. On September 10, 2014, Abrams and Raymond C. Tarlton of Tarlton Law, PLLC entered notices of appearances in this case. See [D.E. 17, 18].[3]

On November 17, 2014, Mann moved for the return of seized property and for a Farmer hearing [D.E. 36]. See United States v. Farmer, 274 F.3d 800 (4th Cir. 2001). On November 20, 2014, the government obtained a superseding indictment, which charged the same crimes as the June 2014 indictment but reduced the amount of forfeitable property to $290,378.03 in U.S. currency. See [D.E. 37] 15. The November 2014 indictment lists as forfeitable property $245,037 in U.S. currency seized from Mann's residence in May 2011 and $45,341.03 seized from Mann's bank accounts. See id.

On December 11, 2014, the court held a pretrial conference. See [D.E. 49]. At the conference, the court denied several defense motions, and Mann's counsel withdrew the motion for the return of seized property and for a Farmer hearing. See id.

At the April 8, 2015 pretrial conference, in addition to addressing the Brady and Giglio issues discussed above, the court denied three of Mann's motions to dismiss. See [D.E. 70, 78]. At the

_____

[3] After the lis pendens were released, Mann attempted to secure a loan to serve as his retainer, "[b]ut these efforts were ultimately unsuccessful, as multiple banks refused to loan him money." [D.E. 36] 7. Thus, Abrams and Tarlton entered their notices of appearances in this case in reliance upon a promissory note securing their legal fees. [D.E. 75] 8.

12

conference, the government informed the court and defense counsel that it would no longer be seeking direct forfeiture and that it would instead seek a money judgment at sentencing. See [D.E. 78] 22–23.

## II.

In Mann's motion to dismiss for wrongful deprivation of his right to counsel, Mann argues that the government illegally seized and retained his assets, which deprived him of the right to the counsel of his choice. See [D.E. 75] 1. Alternatively, Mann asks the court "to order the [g]overnment to release all assets seized from [Mann] and/or his wife because the [g]overnment has abandoned its intent to seek forfeiture of the specific property listed in the forfeiture notice in the Superseding Indictment." Id. In arguing that the government illegally seized his assets, Mann specifically claims (1) there was no legal authority for the bank-account seizures in May 2011; (2) the notices of lis pendens against his properties in June 2011 constituted unlawful restraints; and (3) the government exceeded its authority under the search warrant to seize all cash found in Mann's home and office in May 2011 or, alternatively, that the government's continued retention of the currency seized from his residence and office became unlawful after July 9, 2013, when the government transferred the currency to the United States Marshals Service. See [D.E. 75, 123-1].

## A.

Mann argues that the government had no legal authority to seize the money in the East Carolina Bank accounts and the Navy Federal Credit Union bank account. See [D.E. 75] 11; [D.E. 123-1] 10–16. In support, Mann contends that Agent Ferris knowingly misstated facts to Judge Jones in the affidavit that she submitted in support of the seizure warrants and that no evidence supported the notion that the bank accounts contained money directly traceable to Mann's alleged unlawful conduct. Mann also contends that Agent Ferris's reference to "substitute assets" in her

13

affidavit was misleading in that, as a matter of law, the government could not use a substitute-assets theory to seize the three bank accounts in 2011. See July Hr'g Tr. 26, 29–31.[4]

In response, the government concedes that Agent Ferris had no evidence when she executed the affidavit in support of the seizure warrants to assert that the bank accounts contained "assets/proceeds from the specified unlawful activity." See July Hr'g Tr. 65–68; Gov't Surreply Mot. Dismiss Wrongful Deprivation [D.E. 94] 1 n.1. Nonetheless, the government argues that it had authority to seize the money in Mann's bank accounts, preindictment, under a substitute-assets theory and pursuant to 21 U.S.C. § 853, whose procedures are made applicable by 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). In making that argument, the government assumed that the seizure warrants that Magistrate Judge Jones issued in May 2011 against Mann's bank accounts were criminal forfeiture warrants under 21 U.S.C. § 853(f). See July Hr'g Tr. 57.

Agent Ferris should not have stated in her affidavit to Magistrate Judge Jones that the bank

---

[4] To the extent Mann argues that 18 U.S.C. § 981 can never provide authority for the forfeiture of substitute assets, he is mistaken. See, e.g., United States v. Alamoudi, 452 F.3d 310, 313–14 (4th Cir. 2006); United States v. Patel, 949 F. Supp. 2d 642, 654–56 (W.D. Va. 2013). Although Mann correctly notes that a typical in rem forfeiture judgment pursuant to 18 U.S.C. § 981 cannot reach substitute assets, 28 U.S.C. § 2461(c) provides an exception. Under section 2461(c), the government can seek criminal forfeiture pursuant to the standard criminal forfeiture "procedures" of 21 U.S.C. § 853 (including the seizure of substitute assets) during the prosecution of offenses for which the civil forfeiture of property is authorized under 18 U.S.C. § 981, even where there is no criminal forfeiture statute directly applicable to the offense. See 28 U.S.C. § 2461(c). Thus, the government can reach substitute assets using the procedures of 21 U.S.C. § 853(p) when pursuing criminal forfeiture under 28 U.S.C. § 2461(c), made applicable by 18 U.S.C. § 981. See, e.g. Alamoudi, 453 F.3d at 313–14; Patel 949 F. Supp. 2d at 654–56.

Although the court recognizes that in certain circumstances the government can seize substitute assets pursuant to the trifecta of authority in 18 U.S.C. § 981, 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p), as discussed below, the court questions whether, in this case, the government properly invoked section 2461(c) when it seized Mann's bank accounts in May 2011. The court also questions whether the government provided sufficient information to Magistrate Judge Jones for him to determine under 21 U.S.C. § 853(f) or (p) the need for substitute property and the need for a seizure warrant.

14

accounts contained "assets/proceeds from the specified unlawful activity." When Agent Ferris made that statement on May 20, 2011, she had no basis for doing so. Neither she nor the government had reason to believe that the bank accounts contained directly traceable proceeds because they did not yet have access to the account records and had no witness connecting these three bank accounts to any cash kickbacks or theft proceeds. See July Hr'g Tr. 65–68, 73; Gov't Surreply Mot. Dismiss Wrongful Deprivation [D.E. 94] 1 n.1.[5] Notably, Agent Ferris's statement appears to be the sole basis for Magistrate Judge Jones's probable cause determination supporting the bank account seizure warrants; without the unsupported statement, "the affidavit's remaining content is insufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154, 156 (1978); see [D.E. 87-17]. Magistrate Judge Jones understandably relied on Agent Ferris's representation in a sworn affidavit when finding probable cause. Because it is now clear, however, that Agent Ferris's statement was unsupported, it also is clear that the seizure warrants issued in direct reliance upon that statement were invalid and that the government wrongfully seized Mann's bank accounts.

The government attempts to cure Agent Ferris's defective statement to Magistrate Judge Jones by arguing that the three bank accounts either were initially seized as substitute assets or that, even if the three bank accounts were originally seized under a direct-proceeds theory, the government's continued retention of the bank-account holdings was proper because the holdings will be forfeitable as substitute property if Mann is convicted. See Gov't Surreply Mot. Dismiss Wrongful Deprivation [D.E. 94] 2–8 ("Since the evidence at trial will show the gross proceeds from

_____

[5] In fact, the government's subsequent analysis of the three seized bank accounts confirmed that two of the bank accounts contained "no cash deposits," see [D.E. 87-15] 3, while the third account, into which Mann and his wife deposited their social security checks and Mann's federal salary, had only six cash deposits, five of which were from 2005 and one was a $600 cash deposit from 2009. [D.E. 87-15] 4.

these sales were in excess of the amount seized, all of the seized assets will be subject to post-trial forfeiture. . . . [and] this court has the authority to order the forfeiture of any other property of the Defendant, including the three bank accounts seized in May 2011, until the sum of forfeitures equals the gross proceeds of the crimes charged."); July Hr'g Tr. 68 (the government argues that Agent Ferris represented to Magistrate Judge Jones that the bank accounts contained "either proceeds or it's some other property that's untainted that would be substituted" for the direct proceeds).

To the extent the government argues that the bank accounts were initially seized as substitute assets, the court rejects the argument.[6] There is no record evidence that the government made any showing to Magistrate Judge Jones that Mann's "acts or omissions" had limited the availability of traceable property so as to subject substitute property to forfeiture under 21 U.S.C. § 853(p). See In re Restraint of Bowman Gaskins Fin. Grp., 345 F. Supp. 2d 613, 622 (E.D. Va. 2004) (noting in a case dealing with direct criminal forfeiture under 18 U.S.C. § 982 that "substitute property may

---

[6] The Fourth Circuit is the only circuit that allows for the pretrial restraint of substitute assets under 21 U.S.C. § 853. See, e.g., United States v. Bromwell, 222 F. App'x 307, 309–311, 311 n.2 (4th Cir. 2007) (per curiam) (unpublished) (collecting cases); United States v. Bollin, 264 F.3d 391, 421–22 (4th Cir. 2001); In re Billman, 915 F.2d 916, 919–21 (4th Cir. 1990); United States v. Wingerter, 369 F. Supp. 2d 799, 806–07 (E.D. Va. 2005). Moreover, the Fourth Circuit has held that "the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p) relates back to the date of the acts giving rise to the forfeiture under 21 U.S.C. § 853"; thus title to a defendant's substitute property vests with the United States when the criminal violation giving rise to forfeiture occurs. United States v. McHan, 345 F.3d 262, 271–72 (4th Cir. 2003); see 21 U.S.C. § 853(c).

This court need not resolve how McHan's holding regarding substitute property and the relation-back doctrine comports with the Fourth Circuit's decision in Farmer or operates in cases where there is an ever-changing calculation of forfeitable property. Nonetheless, the court notes that the United States Supreme Court recently granted certiorari in United States v. Luis, 564 F. App'x 493 (11th Cir. 2014), to address a related issue. See Luis v. United States, 135 S. Ct. 2798 (2015) (granting certiorari in a case involving forfeiture under 18 U.S.C. § 1345, which specifically allows for pretrial restraint of substitute property, to resolve a circuit split on whether the restraint of untainted assets needed to retain counsel of choice in a criminal case violates the Fifth and Sixth Amendments).

16

Case 2:14-cr-00014-D   Document 143   Filed 10/13/15   Page 16 of 40

be restrained pre-indictment only if there is probable cause to believe that forfeitable property of at least the same value has been made unavailable by some means described in [21 U.S.C. §] 853(p)(A)-(E)"); cf. United States v. Gordon, 710 F.3d 1124, 1165–68 (10th Cir. 2013) (collecting cases holding that the government has the burden of making the necessary showing under 21 U.S.C. § 853(p)); Alamoudi, 452 F.3d at 315 (noting that it is proper for a judge to determine "that the government has satisfied the requirements of [21 U.S.C. §] 853(p)"). The government presented no evidence to Magistrate Judge Jones that substitute property would be necessary because the government presented no evidence that Mann had transferred, moved, sold, traded, abandoned, or otherwise placed beyond the court's jurisdiction any forfeitable property. See 21 U.S.C. § 853(p). Moreover, because the government did not yet have Mann's bank-account records or a witness linking the three bank accounts to Mann's alleged criminal conduct, the government did not have evidence to suggest that Mann had deposited forfeitable property in the three bank accounts. See 21 U.S.C. § 853(p)(1)(B).[7]

Likewise, the court rejects the government's post-hoc rationalization that because Mann's bank-account holdings may be forfeitable if Mann is convicted at trial, then the government's actions

---

[7] At oral argument, the government argued that on May 20, 2011, the agents had reason to believe that Mann had $242,400 in cash in direct proceeds. See July Hr'g Tr. 59–60. Although there is some evidence showing that the government thought Mann had requisitioned up to $12 million of government property for the Range, see [D.E. 87] 12–13, the affidavits supporting the bank account seizure warrants used a $300,000 loss figure. See [D.E. 87-17]. In light of the $300,000 loss figure presented to Magistrate Judge Jones concerning the bank account seizure warrants, the alleged need for substitute assets on May 20, 2011, is particularly suspect given that, the very same day, the government seized, pursuant to a Rule 41 search warrant, $245,037 in cash from Mann's home and $23 in cash from Mann's office claiming probable cause that the cash represented direct proceeds of Mann's criminal activity. Here, the government should have waited until the Rule 41 search warrants were executed and any "fruits of the crime" on Mann's property were seized and counted before attempting to seize bank-account holdings that the government had no evidence to suggest contained direct proceeds of Mann's alleged criminal activity.

17

in May 2011 were proper or excusable. The probable cause underlying the issuance of the warrants was defective, and the government cannot cure that defect by arguing that it could have legally seized the bank accounts in May 2011 using other means or through proper process. Thus, regardless of whether the money seized from the bank accounts will be subject to forfeiture if Mann is convicted, the government lacked lawful authority to seize Mann's three bank accounts on May 20, 2011.

As for the government's argument that 28 U.S.C. § 2461(c) provided authority to seize Mann's bank accounts preindictment, the court disagrees. See July Hr'g Tr. 57; [D.E. 125]. Section 2461 acts as a "'bridge' or 'gap-filler' between civil and criminal forfeiture, authorizing criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized." United States v. Blackman, 746 F.3d 137, 143 (4th Cir. 2014) (quotations omitted). Thus, when applicable, section 2461 effectively converts 18 U.S.C. § 981 into a criminal forfeiture statute and allows the government to use the criminal forfeiture procedures in 21 U.S.C. § 853. See 28 U.S.C. § 2461; see Blackman, 746 F.3d at 142–43; Alamoudi, 452 F.3d at 313–14.

Section 2461(c) states:

If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

28 U.S.C. § 2461(c). By its plain language, 28 U.S.C. § 2461(c) sets a condition precedent to its application: being charged in a criminal case via an indictment or an information. See 28 U.S.C. §

18

2461(c) ("If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized. . . ." (emphasis added)). This natural, unambiguous reading of the statute is supported by the subsection's statutory history. The first version of section 2461(c) read:

> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information in accordance with the Federal Rules of Criminal Procedure, and upon conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act (21 U.S.C. 853), other than subsection (d) of that section.

28 U.S.C. § 2461(c) (2000) (emphasis added). In 2006, Congress amended section 2461(c) to the current version, at least partially in response to United States v. Razmilovic, 419 F.3d 134 (2d Cir. 2005). See [D.E. 125] 7; see also United States v. Capoccia, No. 1:03-cr-35-jgm-1, 2011 WL 1930677, at *5 (D. Vt. May 19, 2011) (unpublished); Brian T. Yeh and Charles Doyle, Cong. Research Serv., RL 33239, USA PATRIOT Improvement and Reauthorization Act of 2005 (H.R. 3199): A Legal Analysis of the Conference Bill 47 & n.145 (2006). In Razmilovic, the Second Circuit interpreted the 2000 version of section 2461(c) and held that the "upon conviction" language clarified that section 2461(c) "[did] not authorize pretrial restraint of forfeitable assets." Razmilovic, 419 F.3d at 137.

By removing the "upon conviction" language of the 2000 version when amending section 2461(c) in 2006, Congress made "clear the procedures of 21 U.S.C. § 853 authorize the pre-conviction restraint of property subject to criminal forfeiture." Capoccia, 2011 WL 1930677 at *5. Notably, however, when specifically amending 28 U.S.C. § 2461(c) to allow for pre-conviction restraint of forfeitable property, Congress chose not remove the language requiring an indictment

19

or information. To the contrary, Congress clarified that an indictment or information is <u>required</u> under section 2461(c) by inserting the word "if" directly before the indictment or information clause. Thus, a plain reading of section 2461(c) demonstrates that through the amendment Congress allowed the government to seek pre-conviction, postindictment restraint of a defendant's assets.

Simply put, there is a toll to cross the section 2461(c) bridge to the procedures of 21 U.S.C. § 853—the return of an indictment or a defendant's consent to an information. Once the government pays the toll by charging the defendant in a criminal case via indictment or information for violating a statute for which civil forfeiture is authorized, the government may use the applicable procedures in 21 U.S.C. § 853 to pursue criminal forfeiture. Cf. Blackman, 746 F.3d at 143 ("Section 2461 acts as a 'bridge' or 'gap-filler' . . . authorizing criminal forfeiture when no criminal forfeiture provision <u>applies to the crime charged against a particular defendant</u> but civil forfeiture <u>for that charged crime</u> is nonetheless authorized." (emphasis added)).[8]

Here, civil forfeiture under 18 U.S.C. § 981 was authorized for all crimes charged in this case (both the crimes that Agent Ferris initially referenced to Magistrate Judge Jones in May 2011 and those charged in the indictments in 2013 and 2014).[9] However, because the government had not yet

---

[8] 28 U.S.C. § 2461(c) allows the government to pursue the restraint of assets for criminal forfeiture pretrial and postindictment via a restraining order pursuant to 21 U.S.C. § 853(e)(1)(A) or a seizure warrant under 21 U.S.C. § 853(f).

[9] The civil forfeiture statute, 18 U.S.C. § 981, authorizes civil forfeiture of any property that is "derived from proceeds traceable to a violation" of certain enumerated crimes or from an "offense constituting 'specified unlawful activity'" as defined in 18 U.S.C. §1956(c)(7), or a conspiracy to commit these offenses. 18 U.S.C. § 981(a)(1)(C). In turn, 18 U.S.C. § 1956(c)(7) classifies as "specified unlawful activity" any offense under section 641 as well as "any act or activity constituting an offense listed in" 18 U.S.C. § 1961(1). See 18 U.S.C. §1956(c)(7)(listing exceptions that do not apply here). In turn, 18 U.S.C. § 1961 classifies section 201 offenses and section 1951 offenses as acts constituting an offense under 18 U.S.C. § 1961. Thus, section 201 offenses and section 1951 offenses are also subject to civil forfeiture.

Case 2:14-cr-00014-D Document 143 Filed 10/13/15 Page 20 of 40

indicted Mann when it obtained the seizure warrants for the bank accounts, the government had not yet crossed the section 2461(c) bridge to the procedures of 21 U.S.C. § 853. Thus, the government did not yet have the statutory authority to obtain a seizure warrant under section 853(f) against Mann's bank accounts.

At oral argument and in supplemental briefing, the government strongly disagreed with the court's reading of 28 U.S.C. § 2461(c). See July Hr'g Tr. 69–74, 92–96; [D.E. 125]. The government relied on United States v. Schlotzhauer, No. 06-00091-01/03-CR-W-GAF, 2008 WL 320717 (W.D. Mo. Feb. 4, 2008) (unpublished), to support its position that 28 U.S.C. § 2461(c) allows for the pre-indictment restraint of assets. See July Hr'g Tr. 69.

The court rejects the argument. First, Schlotzhauer involved forfeiture under 18 U.S.C. § 38(d), not 28 U.S.C. § 2461(c). See Schlotzhauer, 2008 WL 320717, at * 9. Second, the Schlotzhauer court was analyzing a "postindictment" restraining order. Id. Third, Schlotzhauer merely stands for the unremarkable proposition that section 2461(c) "authorizes the pretrial restraint of assets." Id.; see also United States v. Dupree, 781 F. Supp. 2d 115, 130–31 (E.D.N.Y. 2011). Pretrial does not equal pre-indictment, and Schlotzhauer does not conflict with the court's reading of section 2461(c). See, e.g., Schlotzhauer, 2008 WL 320717, at *8 ("The court may order the pretrial restraint of assets ex parte once an indictment has been issued." (emphasis added)).

The government also argued that reading 28 U.S.C. § 2461(c) to require an indictment or information "reads into subsection 2461(c) a limitation that is not expressly there, and . . . is inconsistent with the rest of subsection (c), which expressly incorporates the procedures of 21 U.S.C. § 853 to all stages of a criminal proceeding, except that 853(d) only applies in cases in which a defendant is convicted." [D.E. 125] 2. In support, the government contends that the three sentences in 28 U.S.C. § 2461(c) are not connected and that the first sentence does not serve as a condition

21

precedent to the third sentence. See [D.E. 125] 4.

The court rejects the government's construction of section 2461(c). Simply put, to read the third sentence of section 2461(c) in isolation makes no sense. Without reference to the prior two sentences of section 2461(c), the third sentence of section 2461(c) merely reiterates 18 U.S.C. § 982(b)(1) with a confusing exception and no frame of reference. A more natural reading of 28 U.S.C. § 2461(c) is that the third sentence of section 2461(c) follows from the first two sentences, and it merely notes that if section 2461(c) forfeiture is authorized, the procedures of section 853 apply. Indeed, in the 2000 version of section 2461(c), Congress used a single sentence, joining the relevant clauses by "and" conjunctions, and the government has not shown that Congress's decision to convert the language into three sentences in 2006 was intended to be a substantive rather than a stylistic change. See 28 U.S.C. § 2461(c) (2000).

Next, the government argues that "with respect to the overall purpose of section 2461, it also appears that the first sentence of 2461(c) was not intended by Congress to limit the seizure of forfeitable property to instances when a person has already been charged" and that through section 2461(c) "Congress intended that civil forfeiture mirror criminal forfeiture in both substance and procedure." [D.E. 125] 5. The court has examined the relevant legislative history and has not found it illuminating. Given the unambiguous statutory language, the court need not resort to the legislative history looking for "friends" to bolster or undermine the statute's plain language. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." (emphasis added)); Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (deriding the use of legislative history

22

"as the equivalent of entering a crowded cocktail party and looking over the heads of guests for one's friends").

Likewise, the court does not agree with the government that reading section 2461(c) to require the return of an indictment or the filing of an information creates an untenable inconsistency between criminal forfeiture pursuant to 28 U.S.C. § 2461(c) and criminal forfeiture under 18 U.S.C. § 982. When pursuing direct criminal forfeiture under 18 U.S.C. § 982, the government can seek a temporary preindictment restraining order under 21 U.S.C. § 853(e)(1)(B). Any inconsistency between the government's ability to restrain assets preindictment when pursuing direct criminal forfeiture rather than section 2461(c) forfeiture is appropriate given the separate statutory authority for each. Had Congress intended to extend direct criminal forfeiture and all of its applicable procedures to all violations contemplated in 18 U.S.C. § 981, it could have amended 18 U.S.C. § 982 to mirror the offenses listed in 18 U.S.C. § 981. Congress did not do so, and the plain language of 28 U.S.C. § 2461(c) clarifies that Congress drew a distinction between direct criminal forfeiture under 18 U.S.C. § 982 and criminal forfeiture pursuant to 28 U.S.C. § 2461(c): 28 U.S. C. § 2461(c) requires the return of an indictment or the filing of an information before the procedures of 21 U.S.C. § 853 apply.[10]

Next, the government claims that the court's reading of 28 U.S.C. § 2461(c) conflicts with the language in section 2461(c) stating that the procedures of 21 U.S.C. § 853 "apply to all stages of a criminal forfeiture proceeding." 28 U.S.C. § 2461(c); see [D.E. 125] 2. Essentially, the government argues that "all stages of a criminal forfeiture proceeding" includes an amphorous and

---

[10] The court need not address the interaction between 28 U.S.C. § 2461(c) and the filing of a criminal complaint. See Fed. R. Crim. P. 3. The government never sought or obtained a criminal complaint in this case.

unlimited preindictment phase, and, therefore, the preindictment procedures in 21 U.S.C. § 853 can apply when forfeiture is pursued through 28 U.S.C. § 2461(c).

The court disagrees. The language in 28 U.S.C. § 2461(c) extending the procedures of 21 U.S.C. § 853 to "all stages of a criminal forfeiture proceeding" comports with the condition precedent of an indictment or information because a criminal forfeiture proceeding under 28 U.S.C. § 2461(c) becomes possible upon the return of an indictment or filing of an information with a notice of forfeiture. See 28 U.S.C. § 2461(c).

Next, the government argues that if Congress intended to require an indictment or information for forfeiture under 28 U.S.C. § 2461(c), then it "would have excluded [21 U.S.C. §] 853(e)(1)(B)," the procedure allowing for preindictment restraining orders, like it "expressly excluded [21 U.S.C. §] 853(d)." See [D.E. 125] 8. The court rejects the argument. Excluding 21 U.S.C. § 853(a)(1)(B) in 28 U.S.C. § 2461(c) would have been superfluous in light of the plain language in section 2461(c) requiring the return of an indictment or filing of an information before the procedures of 21 U.S.C. § 853 apply. Because section 2461(c) applies only "if a person is charged in a criminal case," Congress had no reason to exempt the preindictment provisions of section 853 because those provisions would not apply postindictment. Cf. Razmilovic, 419 F.3d at 137 ("There was thus no need for Congress specifically to exclude any provisions of Section 853 relating to pretrial procedures because such procedures are inapplicable to post-conviction proceedings and were not even purportedly incorporated into Section 2461(c). In contrast, there was a need to exclude Section 853(d) explicitly because it establishes a rebuttable presumption [at trial] that certain property is subject to forfeiture. . . . The only plausible reading of Section 2461(c) therefore is that it incorporates . . . all of Section 853's procedures relevant to post-conviction forfeiture, except subsection (d).").

24

Lastly, although the government argues that it "is not aware of any legal authority interpreting Section 2461(c) to prohibit preindictment seizures of forfeitable assets," the government fails to cite a single case allowing the preindictment seizure of assets under 28 U.S.C. § 2461(c). See [D.E. 125] 6.[11] Absent any legal authority expressly allowing the government to seize a person's property, the government is not free to do as it pleases. See U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law. . . ."); United States v. Kaley, 677 F.3d 1316, 1327 (11th Cir. 2012) ("It's worth emphasizing that the prosecution cannot unilaterally restrain a defendant's assets between the time of indictment and trial."), aff'd, 134 S. Ct. 1090 (2014).

In sum, the government cannot overcome section 2461(c)'s clear statutory requirement that an indictment be obtained or an information be filed before the procedures in 21 U.S.C. § 853 apply. Thus, the preindictment seizures of Mann's bank accounts were unlawful.

Alternatively, even if the government had the authority for a preindictment seizure of Mann's three bank accounts under section 2461(c), it violated procedural requirements. Magistrate Judge Jones never explicitly found, as required under 21 U.S.C. § 853(f) for criminal forfeiture warrants, that a restraining order under 21 U.S.C. § 853(e) would not suffice to ensure the availability of the property at trial. See 21 U.S.C. § 853(f) ("If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.").

---

[11] The government's citation to De Almeida v. United States, 459 F.3d 377, 379 (2d Cir. 2006), fails. In De Almeida, the Second Circuit was analyzing a post-conviction, criminal forfeiture under 18 U.S.C. § 982(b), not 28 U.S.C. § 2461(c).

Nor did Agent Ferris's affidavit contain competent evidence that would have supported such a finding. [D.E. 87-17, 87-19]; cf. United States v. Martin, 460 F. Supp. 2d 669, 677 (D. Md. 2006) (where underlying affidavits addressed the relevant issues under 21 U.S.C. § 853(f), the court assumed the magistrate judge made the required finding).[12] Because the government made no showing to Magistrate Judge Jones regarding the need for a seizure warrant rather than a restraining order to ensure the availability of the bank account funds for forfeiture, the government lacked a sufficient basis to obtain a seizure warrant under 21 U.S.C. § 853(f) against the three bank accounts.

Notably, "[b]oth Congress and the Constitution see pretrial restraining orders as preferable, somewhat less restrictive alternatives to outright seizure. It would frustrate that preference were the government able to seize property more easily than it could restrain it." United States v. Melrose E. Subdivision, 357 F.3d 493, 504 (5th Cir. 2004). In 21 U.S.C. § 853(e), Congress explicitly limited the ability of the government to seek preindictment restraining orders. Under section 853(e)(1)(B), a court can enter a preindictment restraining order only after making specific findings and giving notice and an opportunity to be heard to all interested persons. See 21 U.S.C. § 853(e)(1)(B); Kaley v. United States, 134 S. Ct. 1090, 1095 n.2 (2014) ("The forfeiture statute itself [21 U.S.C. § 853(e)(1)(B)] requires a hearing when the Government seeks to restrain the assets of someone who has not yet been indicted."). Furthermore, a preindictment restraining order under 21 U.S.C. § 852(e)(1)(B) "shall be effective for not more than ninety days, unless extended by the court

---

[12] Relying on United States v. Dupree, 781 F. Supp. 2d 115, 132 (E.D.N.Y. 2011), the government argues that "[t]here is no requirement under § 853(f) . . . that the Judicial Officer issuing the seizure warrants explicitly state that a restraint under 853(e) may not have sufficiently assured the availability of funds" and that courts can presume that a magistrate judge made required findings. See [D.E. 125] 3 n.1. Although this court affords a magistrate judge's findings substantial deference (where appropriate), when there is no showing regarding a material issue in the supporting materials presented to the magistrate judge, this court will not presume that the magistrate judge made a statutorily-required finding.

for good cause shown or unless an indictment . . . has been filed." 21 U.S.C. § 853(e)(1)(B). Likewise, under 21 U.S.C. § 853(e)(2), a court can issue a preindictment temporary restraining order "without notice or opportunity for a hearing" only if "the United States demonstrates that there is probable cause to believe that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section and that provision of notice will jeopardize the availability of the property for forfeiture." 21 U.S.C. § 853(e)(2). The temporary restraining order will "expire not more than fourteen days after the date on which it is entered, unless extended for good cause shown or unless the party against whom it is entered consents," and the court must hold a requested hearing "at the earliest possible time and prior to the expiration of the temporary order." Id.

The government's nearly two-year, preindictment restraint of the money in Mann's three bank accounts pursuant to a seizure warrant and without proper process frustrates Congress's preference. Had the government sought to restrain these assets under 21 U.S.C. § 853(e), it would have been subject to specific procedures and timelines. See 21 U.S.C. § 853(e). The government cannot escape those responsibilities by seeking a section 853(f) warrant without making a specific showing that a section 853(e) restraining order "would not be sufficient to assure the availability of the property for forfeiture." See 21 U.S.C. § 853(f). The government did not make that showing in May 2011, and its May 2011 seizure of Mann's three bank accounts was unlawful.

Although the government's May 2011 seizure of three of Mann's bank accounts was unlawful, the government has adequately remedied the seizures. Specifically, at oral argument on July 24, 2015, the government informed the court that it had "decided to return the funds from the bank accounts." July Hr'g Tr. 55–56. Moreover, on August 4, 2015, the government notified the court that the government had "returned to Defendant the funds seized from Defendant's bank

27

accounts." [D.E. 131]; see [D.E. 132–134].

B.

Next, Mann argues that the government (1) improperly placed lis pendens on 36 pieces of his real property in June 2011 because there was no pending action against Mann that affected title to his real property at that time and (2) improperly failed to serve Mann with the notices of lis pendens in accordance with North Carolina General Statute § 1-116.1. See [D.E. 123-1] 18–23; July Hr'g Tr. 26, 30–32; 28 U.S.C. § 1964. In support, Mann notes that he was not indicted until April 2013 and that the law of the state where the real property is located (i.e., North Carolina) dictates the manner in which the government may file "a notice of an action concerning real property pending in a United States district court." See 28 U.S.C. § 1964 (emphasis added). Mann then states that under applicable North Carolina law, "[n]otice of pending litigation may be filed . . . [a]t or any time after real property has been attached." N.C. Gen. Stat. § 1-116 (emphasis added). Furthermore, Mann argues that in order for a lis pendens to be proper under North Carolina law, the pending action must directly concern title to the real property. See, e.g., N.C. Gen. Stat. § 1-116(a); George v. A.O.C., 142 N. C. App. 479, 483– 84, 542 S.E.2d 699, 702–03 (2001). Additionally, Mann argues that North Carolina requires a party who obtains a lis pendens to then serve it on the property owner in accordance with N.C. Gen. Stat. § 1-116.1, but that the government failed to do so.

The government responds that it can file a "lis pendens" before commencing a civil-forfeiture action or obtaining an indictment. In support, the government cites In re Certain Property Located at Lot 8, 763 F. Supp. 150 (W.D.N.C. 1991), a case decided before Congress enacted 28 U.S.C. § 2461(c) in the Civil Asset Forfeiture Reform Act ("CAFRA").

The court rejects the government's argument. By definition, both 28 U.S.C. § 1964 and the term "lis pendens" require a pending action. See 28 U.S.C. § 1964; *Lis Pendens*, Black's Law

28

Dictionary (10th ed. 2014) ("1. A pending lawsuit. 2. The jurisdiction, power, or control acquired by a court over property while a legal action is pending. 3. A notice . . . required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation . . . ."); see also *Pending*, Black's Law Dictionary (10th ed. 2014) ("1. Remaining undecided; awaiting decision . . . ."). The government filed at least 36 lis pendens in June 2011, twenty-two months before the grand jury indicted Mann. See [D.E. 123-1] 19–21. When the government filed the 36 lis pendens in June 2011, there was no "pending" action in this court and the lis pendens were improper.

As for In Re Certain Property, in that case the court was analyzing directly traceable property, and it specifically limited its holding to cases where "the Government ha[s] shown a reasonable connection between the properties and illegal activities." In Re Certain Property, 763 F. Supp. at 152 n.1. With the exception of the real property containing Mann's residence, where he allegedly accepted improper payments, the government has never shown (or alleged) a nexus between the charged crimes and Mann's other pieces of real property. Cf. [D.E. 89-6] 1–3 (email from Michael Higgins to Agent Ferris noting that Mann has held "some of the properties for a long time" and an attached list of properties with the newest deed listed as March 16, 2006). Moreover, to the extent In Re Certain Property suggests that the government can file a notice of a lis pendens before an action is pending, this court respectfully disagrees.

Because there was no pending action when the government filed the lis pendens in June 2011 against Mann's real properties, such a restraint was unlawful from the date the lis pendens were filed until Mann was indicted in April 2013. Because the court agrees with Mann that the government's initial filing of the lis pendens in June 2011 was unlawful, the court need not consider Mann's other arguments concerning whether the government procedurally complied with North Carolina law when

29

filing the lis pendens. Cf. United States v. Woods, 436 F. Supp. 2d 753, 754–55 (E.D.N.C. 2006).

As for remedy, the government has adequately remedied the improper lis pendens. Specifically, on July 25, 2014, the government filed notices of withdrawal for each of the lis pendens. See [D.E. 128-1–128-36]. In August 2014, the government gave notice to Mann "that it had released the lis pendens on his rental properties." [D.E. 75] 8. Moreover, the government has represented that Mann's properties "are not named in the indictment or otherwise the subject of forfeiture proceedings . . . and [now] appear largely lien-free." [D.E. 43] 6.

C.

As for the $245,037 in cash seized from Mann's residence and the $23 in cash seized from Mann's office on May 20, 2011, Mann argues that the government failed to file a civil forfeiture claim within 60 days of the May 20, 2011 seizure. See [D.E. 123-1] 26; July Hr'g Tr. 32. Furthermore, Mann argues that when the government transferred the cash to the United States Marshals Service on July 9, 2013, the evidentiary value of the property evaporated and the government had to obtain a seizure warrant or restraining order to maintain custody of the property. See [D.E. 123-1] 24–28; July Hr'g Tr. 32–35. Because the government failed to do so and because the government now seeks a money judgment, Mann argues that the court should either dismiss the indictment with prejudice or order the government to return the $245,037 seized from Mann's home and the $23 seized from Mann's office. See [D.E. 75] 12–14.

In response, the government notes that probable cause supported the search warrants concerning Mann's residence and office and that probable cause supported the belief that the cash found in Mann's home and office was proceeds of Mann's alleged criminal behavior. Moreover, the government notes that Mann did not file a motion for return of the property under Rule 41(g) of the Federal Rules of Criminal Procedure after the seizure of the cash from Mann's home and office. See

30

[D.E. 87] 17 n.16; cf. Fed. R. Crim. P. 41; Local Criminal Rule 12.1. Rather, after the seizures on May 20, 2011, Mann retained counsel who immediately entered plea negotiations with the government. See July Hr'g Tr. 63. As part of the plea negotiations, Mann's counsel asked the government to permit counsel to deposit the seized cash in counsel's trust account during the plea negotiations, but the government declined that request. Id. 63–64. Thereafter, Mann's counsel could have filed a motion for return of property under Rule 41(g) of the Federal Rules of Criminal Procedure and asked the court to order the government to return some or all of the money seized, but Mann's counsel failed to make such a motion. Id. 26. Thus, the government argues that it did not act improperly in retaining the cash from the seizure on May 20, 2011.

The court agrees that probable cause supported seizing the cash found in Mann's home and office as "fruits of the crime" and that Mann waived his rights under Rule 41(g) by not timely filing a motion to return some or all of the seized money. Thus, the court agrees with the government that the $245,060 was lawfully seized on May 20, 2011. However, once the government transferred the money to the United States Marshals Service on July 9, 2013, the analysis changes. At the point of transfer on July 9, 2013, the cash lost its evidentiary value and the government should have sought a protective order under 21 U.S.C. § 853(e)(1)(A) or a seizure warrant under 21 U.S.C. § 853(f) in order to continue to retain that money for forfeiture (rather than evidentiary) purposes. See Dep't of Justice Asset Forfeiture Manual 31 (2013), http://www.justice .gov/sites/default/files/criminal-afmls/legacy/2014/05/23/policy-manual-2013rev.pdf ("The seizure of tangible personal property for evidence provides an independent basis for the continued physical possession of property during the pendency of a criminal forfeiture proceeding as long as the evidentiary value of the property persists. . . . However, if the evidentiary value of the property evaporates, the Government must obtain a seizure warrant or restraining order to maintain custody of the property for the purpose of

31

forfeiture."). Accordingly, as of July 9, 2013, the government's continued retention of the $245,060 was improper and the government should have sought a protective order from this court to continue holding those funds.

Given the government's failure to follow proper process as of July 9, 2013, the loss of evidentiary value of the seized funds as of July 9, 2013, and the government's notice in April 2015 to seek a money judgment rather than prove traceability at trial, the court finds it appropriate to use its supervisory powers to order the government to release the $245,060 to Mann. Cf. United States v. Najjar, 57 F. Supp. 2d 205, 208–10 (D. Md. 1999) (citing Billman and noting that while a district court is required to restrain or otherwise secure traceable assets and has the authority to restrain potential substitute assets pretrial, "[i]n the absence of any indication that [the] [d]efendant has attempted to thwart the forfeiture laws" a court is not required to restrain potential substitute property). If the government opposes the return of the $245,060 to Mann and believes that a protective order is necessary to ensure the availability of assets sufficient to satisfy a money judgment, the government can file a motion under 21 U.S.C. § 853(e)(1)(A), as it should have done on July 9, 2013, and the court will consider further argument on the matter. See 21 U.S.C. § 853(e)(1)(A).[13] Accordingly, Mann's alternative motion for the release of seized funds [D.E. 75] is granted.

_____

[13] If the government elects to file such a motion, it must address how its April 2015 decision to seek a money judgment rather than direct forfeiture legally affects this court's ability to order the pre-conviction restraint of assets. Cf. United States v. Newman, 659 F.3d 1235, 1241–46 (9th Cir. 2011); United States v. Gregoire, 638 F.3d 962, 971–72 (8th Cir. 2011); United States v. Kalish, 626 F.3d 165, 168–69 (2d Cir. 2010); United States v. Padron, 527 F.3d 1156, 1161–62 (11th Cir. 2008); United States v. Day, 524 F.3d 1361, 1374–78 (D.C. Cir. 2008); United States v. Vampire Nation, 451 F.3d 189, 198–203 (3d Cir. 2006).

D.

Next, Mann argues that the unlawfulness of the seizures and restraints against his property resulted in a Sixth Amendment violation warranting the dismissal of the indictment with prejudice. Essentially, Mann argues that because his assets were either seized by the government or subject to lis pendens, he was unable to hire Joseph Cheshire in mid-2013 to represent him and was therefore deprived of the right to hire counsel of his choice. See [D.E. 75]; [D.E. 123-1] 30–35; July Hr'g Tr. 36–41. Mann claims that the government's actions resulted in a "structural violation" of the Sixth Amendment under United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), and that "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." Id. at 148.

Unfortunately for Mann, the Sixth Amendment and Gonzalez-Lopez do not reach as far as he would like. First, there is no Sixth Amendment right to representation preindictment. See, e.g., Rothgery v. Gillespie Cty., 554 U.S. 191, 198, 213 (2008); United States v. Lovasco, 431 U.S. 783, 788–89 (1977). Thus, to the extent Mann argues that the seizures and lis pendens in 2011 deprived him of the right to counsel of his choice under the Sixth Amendment before his April 2013 indictment, the argument fails. Second, to the extent Mann argues that the government violated his Sixth Amendment rights by his inability to hire Cheshire in mid-2013 concerning the April 2013 indictment, the court rejects the argument in light of the June 2014 dismissal of that indictment. See Order, United States v. Mann, No. 2:13-CR-16 (E.D.N.C. June 26, 2014), [D.E. 44]. Measured by the government's decision to dismiss the April 2013 indictment in June 2014, any error connected with Mann's inability to retain Cheshire in mid-2013 concerning the April 2013 indictment is harmless beyond a reasonable doubt. Furthermore, Mann retained Cheshire's law partner, Abrams, and Abrams helped to persuade the government to dismiss the April 2013 indictment. Cf. Burger

33

v. Kemp, 483 U.S. 776, 783 (1987) (assuming without deciding that two law partners are considered one attorney under the Sixth Amendment for purposes of analyzing whether there is a conflict of interest). Likewise, the court rejects Mann's speculative suggestion that if Mann had retained Cheshire in mid-2013, then the government might not have presented evidence to the grand jury in 2014 or obtained the June 2014 indictment.

As for the case against Mann arising from the June 2014 indictment, no record evidence suggests that Mann sought to retain Cheshire to defend him in this case. Notably, Cheshire's affidavit speaks only to Mann's attempt to secure Cheshire's representation in mid-2013 concerning the April 2013 indictment, which was dismissed. See [D.E. 75-8]. Thus, Mann's argument fails.

Even if the court assumes that Mann wanted Cheshire to represent him concerning the 2014 indictment and even if the court ignores that Mann retained Cheshire's law partner Abrams and another lawyer (Tarlton), "[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects . . . [including that] a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." Wheat v. United States, 486 U.S. 153, 159 (1988). Here, shortly after the return of the June 2014 indictment and before the court ordered Mann to either seek court-appointed counsel or obtain counsel in connection with the June 2014 indictment, the government released the lis pendens on Mann's properties. At that point, Mann had over $2 million dollars in real property assets with which to secure legal representation. The fact that Cheshire apparently would not represent Mann based on a promissory note or the transfer of real property does not violate the Sixth Amendment. It simply means that Mann could not afford to hire Cheshire on terms adequate to Cheshire. See Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624–25 (1989) ("[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney

34

whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."); Wheat, 486 U.S. at 159.

As for Gonzalez-Lopez, there the government did not dispute that the district court had erroneously deprived the defendant of counsel of his choice by repeatedly denying the defendant's counsel of choice admission pro hac vice and denying a request to have the lawyer sit at counsel's table. See Gonzalez-Lopez, 548 U.S. 143–44. The structural violation in Gonzalez-Lopez is not remotely akin to the situation here. Although the court agrees with Mann that the government wrongfully seized three of his bank accounts in May 2011, wrongfully placed lis pendens on his properties from June 2011 through July 2014, and improperly retained the $245,060 seized from his home and office after transferring the evidence to the United States Marshals Service on July 9, 2013, Mann has not shown that the government structurally violated his Sixth Amendment right to counsel concerning his June 2014 indictment. With the removal of the lis pendens in July 2014, Mann had millions of dollars in assets to secure counsel, and retained Abrams and Tarlton to represent him. Mann's alleged inability to reach acceptable financial terms with Cheshire on his fee in 2014 was neither a Sixth Amendment violation nor the result of the government's actions.

Because Mann has not shown a structural violation of the Sixth Amendment, his ability to obtain the requested relief depends upon whether the government's unlawful actions concerning the seizures and the filing of lis pendens caused him prejudice. As mentioned, Mann retained attorneys Abrams (Cheshire's law partner) and Tarlton in 2014, and they have ably represented him since entering a notice of appearance. Furthermore, the court rejects as speculative Mann's argument that actionable prejudice arises from the "unknown" stemming from Mann's inability to retain Cheshire. See July Hr'g Tr. 39.

In sum, the court denies Mann's motion to dismiss the indictment for wrongful deprivation

35

of defendant's right to the counsel of his choice but grants his alternative motion for the release of seized assets. The government shall return the $245,037 that it transferred to the United States Marshals Service on July 9, 2013. If the government opposes returning the seized money to Mann, the government can file a motion under 21 U.S.C. § 853(e)(1)(A).

## III.

In Mann's motion to dismiss for Brady and Giglio violations, Mann argues that the delay in producing complete criminal history records, coupled with the government's production of approximately 800 pages of discovery two days before the April 2015 trial date, warrants dismissal. See [D.E. 76]. In response, the government disputes that it violated Brady or Giglio or failed to comply with its discovery obligations. See [D.E. 86].

On April 13, 2015, this court granted Mann a three-month trial continuance. See [D.E. 79]. Moreover, on June 26, 2015, the court granted Mann another continuance due to Mann's health [D.E. 109], and Mann's trial is now scheduled to begin on November 2, 2015. See [D.E. 126]. Thus, Mann received the customary remedy for an alleged discovery violation — a trial continuance. See, e.g., United States v. Sterling, 724 F.3d 482, 513 (4th Cir. 2013); United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 532 (4th Cir. 1985); Fed. R. Crim. P. 16(d)(2)(B). Accordingly, Mann's motion to dismiss is denied.

In opposition to this conclusion, Mann argues in his reply brief that since the April 2015 trial continuance, the government has produced an additional 1500 pages of discovery, that some of the discovery should have been produced earlier, and that the government flagrantly violated its discovery obligations. See [D.E. 89]. Accordingly, Mann argues that dismissing the indictment with prejudice is the only appropriate sanction. See id. In response, the government provides a detailed rebuttal to Mann's arguments about discovery. See [D.E. 93].

36

The court has reviewed the entire record, including all of the attachments to Mann's motion, the government's response, Mann's reply, and the government's surreply. See [D.E. 76, 86, 89, 93]. In light of the trial date of November 2, 2015, Mann has had ample time to prepare. Furthermore, Mann has failed to prove that the government violated its Brady or Giglio obligations or otherwise violated its discovery obligations or due process. Mann also has failed to prove his allegations that the government's lawyers and agents conspired to violate the laws governing discovery. Accordingly, Mann's motion to dismiss the indictment for Brady and Giglio violations is denied.

IV.

Finally, the court addresses Mann's motion to dismiss the indictment for grand jury and other misconduct. In this motion, Mann raises many of the same issues already addressed in the motion to dismiss for wrongful deprivation of counsel and the motion to dismiss for Brady and Giglio violations. The court need not repeat itself on those matters. Furthermore, the court rejects as unsupported Mann's arguments regarding "other government misconduct," namely Agent Ferris allegedly "backdating" a report, the government allegedly withholding Brady information relating to assistance provided to cooperating witness Rudy Lozano, and the government allegedly ignoring Lozano's illegal acts. See [D.E. 96].

As for Mann's argument that the government knowingly presented false testimony to the grand jury regarding the traceability of certain property listed in the forfeiture notices, Mann argues that the government used that false testimony "as direct evidence of the allegations in Counts One through Five" because the testimony gave the grand jury the impression that Mann "was caught red-handed with nearly $300,000 in kickback funds." Id. 21, 24. Additionally, Mann claims that Agent Schmoyer falsely testified to the grand jury in June 2014 that Mann "was responsible for . . . disposing of [ ] supplies [and] equipment[] necessary to maintain the range." Id. 23 (alterations in

37

original). To show Agent Schmoyer's statement false, Mann cites a September 24, 2014 email in which Agent Schmoyer told an Assistant United States Attorney that "It was never Harry's responsibility to remove scrap from the range." Id. Mann claims that Agent Schmoyer's testimony influenced the grand jury decision regarding whether Man received money personally in exchange for performing an official act (an essential element) and cites the superseding indictment as evidence because the superseding indictment specifically found that Mann "was responsible for, among other things, . . . ensuring the proper disposal of used military equipment . . . ." See id. 23–24; [D.E. 37] ¶ 5.[14] Mann claims that the government acted in bad faith and argues that the court should dismiss the indictment with prejudice.

The court agrees with Mann that the government provided the grand jury with inaccurate testimony concerning traceability and forfeiture. Collectively, the government was aware in February 2012 that Mann's three bank accounts did not contain traceable property. See [D.E. 75-7]. Nonetheless, two different Assistant United States Attorneys elicited and failed to correct testimony to the contrary during grand jury proceedings in April 2013 and June 2014. See [D.E. 89-4] 20–22 (Agent Ferris testimony); [D.E. 90-1] 41–44 (Agent Schmoyer testimony).[15] In fact, the government acknowledged during oral argument, that each agent's testimony to the grand jury was "not completely [accurate]." See July Hr'g Tr. 82–83, 85–86. Nonetheless, the government claims that the agents testified truthfully and to the best of their knowledge. See July Hr'g Tr. 82–86.

Regardless of whether the agents testified to the best of their personal knowledge, the

---

[14] The June 2014 indictment also included the same finding. See [D.E. 1] ¶ 5.

[15] At oral argument, the government informed the court that no additional testimony was presented to the grand jury in November 2014 before the grand jury issued the superseding indictment. When issuing the superseding indictment in November 2014, the grand jury relied on the evidence that had been presented in June 2014. See July Hr'g Tr. 80–82.

38

government has a "collective knowledge" problem concerning traceability and forfeiture, and the cognizant Assistant United States Attorney handling each grand jury appearance should have corrected the legal inaccuracy that was twice stated to the grand jury. Cf. Kyles v. Whitley, 514 U.S. 419, 438 (1995); United States v. Bagley, 473 U.S. 667, 671–72 (1985); Giglio v. United States, 405 U.S. 150, 154 (1972). Moreover, the court rejects any attempt to explain this failure as an oversight given that each new indictment lowered the applicable forfeiture amount. Thus, with each new indictment, the government was examining forfeiture and should have recognized and corrected this error. As for Agent Schmoyer's testimony concerning Mann's responsibilities, Mann has not shown that Agent Schmoyer's testimony in June 2014 regarding Mann's responsibilities on the Range was false because it is unclear when Agent Schmoyer learned that removing scrap was outside of Mann's job description.

As for remedy, a district court may dismiss an indictment for irregularities in the grand jury proceeding where there is actual prejudice to the defendant. See, e.g., United States v. Brewer, 1 F.3d 1430, 1433 (4th Cir. 1993); United States v. Bowling, No. 7:14-CR-98-D, 2015 WL 3541475, at *3 (E.D.N.C. May 26, 2015). In order to demonstrate such prejudice, a defendant must show that "(1) the irregularity substantially influence[d] the decision to indict or (2) there is grave doubt that the decision to indict was free from the substantial influence of such irregularities." Brewer, 1 F.3d at 1433 (quotation and alteration omitted); see Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988).

Although the court is disappointed with the government's conduct, the court does not believe that the government's conduct merits the most severe sanction of the dismissal of the indictment with prejudice. Mann has not shown that the government's actions were undertaken in bad faith or that they substantially influenced the grand jury's decision to indict on counts one through six.

39

Accordingly, Mann's motion to dismiss the indictment for grand jury and other government misconduct is denied.

V.

In sum, the court GRANTS in part and DENIES in part defendant's motion to dismiss all counts for wrongful deprivation of defendant's right to counsel of his choice and alternative motion for the release of seized assets [D.E. 75]. Specifically, the court DENIES the motion to dismiss the indictment but GRANTS the motion for the release of seized assets and ORDERS the government to return the money seized in May 2011 and converted in July 2013. The court DENIES the motion to dismiss the indictment for Brady and Giglio violations [D.E. 76]. The court DENIES the motion to dismiss the indictment for grand jury and other government misconduct [D.E. 96]. The trial shall begin on November 2, 2015.

SO ORDERED. This 13 day of October 2015.

JAMES C. DEVER III
Chief United States District Judge

40